## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Leanda Rae Muhonen,

      Plaintiff,

v.

Cingular Wireless Employee
Services, LLC, and
Communications Workers of
America Local 7200, AFL-CIO
CLC,

      Defendants.

Civil No. 09-CV-0452 (JRT/SER)

**REPORT & RECOMMENDATION**

---

    Leanda Rae Muhonen, pro se, 7601 Chanhassen Road #305, Chanhassen, Minnesota 55317.

    Kathryn Mrkonich Wilson & Jodie Weinstein Esqs., Littler Mendelson, P.C., 1300 IDS Center, 80 South 8th Street, Minneapolis, MN 55402, for Defendant Cingular Wireless Employee Services, LLC.

    Richard Rosenblatt, Richard Rosenblatt & Associates, LLC, 8085 East Prentice Avenue, Greenwood Village, Colorado 80111, for Defendant Communications Workers of America Local 7200, AFL-CIO CLC.

---

STEVEN E. RAU, United States Magistrate Judge

    This case is before the Court on Defendant Cingular Wireless Employee Services, LLC's and Defendant Communications Workers of America Local 7200's Motions for Summary Judgment [Doc. No. 175 and 187]. This matter was referred to the undersigned by an Order of Reference entered by the District Court on January 27, 2011, pursuant to 28 U.S.C. § 636(b)(1)(B) and District of Minnesota Local Rule 72.1(b). For the reasons set forth below, the Court recommends that the motions be granted.

1

This Court's prior Order on Plaintiff's Motion for Leave to File Amended Complaint [Doc. No. 143] and Report & Recommendation on Defendant Cingular Wireless Employee Services, LLC's Motion to Dismiss [Doc. No. 55] outline the procedural history of this case, which will not be repeated here.

Plaintiff Leanda Muhonen ("Muhonen"),[1] sued her former employer Cingular Wireless Employee Services, LLC ("Cingular"), and her former union, Communications Workers of America Local 7200, AFL-CIO, CLC ("Local 7200"), and asserted claims pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Muhonen's claims are a "hybrid" § 301 claim, which requires a plaintiff to show **both** that the employer breached the terms of a collective bargaining agreement ("CBA") and that the union breached its duty of fair representation under the CBA. If the plaintiff fails to establish either breach, then then entire hybrid claim against both the employer and the union fails.

In this case, Muhonen claims Cingular breached the CBA in connection with an alleged assault on Muhonen by her supervisor and by terminating her without just cause. Cingular argues that no provision of the CBA was breached in connection to the assault and that Muhonen's history of disciplinary problems, insubordination, and inappropriate communications, were just cause for her termination. With respect to the union, Muhonen alleges Local 7200 violated its duty of fair representation when it failed to file grievances for the alleged assault and the termination. Local 7200 responds that claims that its actions in failing to file a grievance for the alleged assault were mere negligence and Muhonen did not suffer a reparable harm. Local 7200 also contends that Muhonen cannot claim a breach of the duty of fair representation for her termination because she never asked the union to file a grievance.

---

[1] Because Plaintiff is pursuing this matter *pro se*, this court must liberally construe Plaintiff's Complaint. *White v. Kautzky*, 494 F.3d 677, 680 n. 1 (8th Cir. 2007).

## I.  FACTS

Cingular employed Muhonen as a customer service representative from October 17, 2005, until her termination on January 20, 2009.  (First Amended Complaint at ¶ 7).  Throughout her employment, Muhonen was a member of the union, Local 7200.  (*Id.* at ¶ 8).  A CBA between Cingular and Local 7200 was in place throughout Muhonen's employment.  (*Id.* at ¶ 9, Muhonen Dep. Ex. 83).[2]  Muhonen was a union steward from 2006 until the end of her employment.  (Muhonen Dep. at 313-14).

### A.  The Union and the CBA

Local 7200's Vice President during the relevant time period was Cindy Danley who worked full-time for the union.  (Danley Decl. at ¶ 1, 6).  Danley's job duties included tracking and investigating grievances and attending grievance meetings.  (*Id.* at 2).  Nine Area Vice Presidents reported to Danley; these Area Vice Presidents worked in bargaining unit positions in addition to their Local 7200 duties.  (*Id.* at 7).  The Area Vice Presidents filed grievances, investigated grievances, and attended grievance meetings.  (*Id.*).  Jeff Fellows was Muhonen's Area Vice President until January 2009, when Robert Mayfield was elected.  (*Id.* at 8).  Stewards appointed by Local 7200, like Muhonen, handled day-to-day issues in the workplace.  (Muhonen Dep. at 314; Danley Decl. at 9).

Article 7 of the CBA, regarding grievance procedures, provided, "[Cingular] and the Union agree that grievances shall be confined to differences arising out of the interpretation or application of the terms or provisions of this agreement, or disciplinary action for just cause and shall be processed according to the Grievance procedure set forth in this Article."  (Muhonen

---

[2]  The Defendants cite to exhibits by referencing the exhibit numbers assigned to the exhibits in Muhonen's deposition.  The Court will cite to these exhibits as "Muhonen Dep. Ex. __."  Muhonen provided exhibits to the Court attached to her Affidavit [Doc. No. 206].  The Court will cite to these exhibits as "Muhonen Aff. Ex. __."

Dep. Ex. 83).   The local union would process the first two steps of the grievance and the International Union processed the third step.  (Danley Decl. ¶ 16).  To initiate a grievance, an employee first filled out a Statement of Occurrence" form.  (*Id.*; Muhonen Dep. at 315; Danley Decl. ¶ 15-18).  Union stewards, including Muhonen, had blank Statement of Occurrence forms. (Muhonen Dep. at 315).  Once Local 7200 received the Statement of Occurrence, it would decide whether or not to file a grievance based on the merits of the claim.  (Muhonen Dep. at 315-16). If the employee did not provide the union with a Statement of Occurrence, Local 7200 could not file a grievance.  (Muhonen Dep. at 316).  Under the CBA, a grievance had to be filed within 30 days of the occurrence.  (Muhonen Dep. at 315; Muhonen Dep. Ex. 83).

Muhonen alleges that Cingular violated Articles 15 and 16 of the CBA.  Article 15 of the CBA, regarding Non-Discrimination, provided, "[Cingular] and the Union agree that they will not discriminate against any employee covered by the Agreement because . . . the person is disabled . . . or [based upon] other protected classifications recognized by Federal or applicable state/local law."  (Muhonen Dep. Ex. 83).  Article 16 of the CBA, regarding Safety, provided that Cingular and the union would establish a committee to make recommendations on occupational safety and health matters.  (*Id.*).

### B.    Cingular's Policies

Cingular had various work-related policies in place during Muhonen's employment and as an employee and union steward, she was familiar with and aware of these policies.  (Muhonen Dep. 126-29; Muhonen Dep. Ex. 10-13).  Because Muhonen worked in a call center, Cingular's Desk and Wireless Phone Usage Policy prohibited swearing, shouting, and talking loudly. (Muhonen Dep. at 127; Muhonen Dep. Ex. 11).  Cingular's Internet Access Policy prohibited the sending of emails that were abusive or that contained threatening or harassing language.

(Muhonen Dep. at 127; Muhonen Dep. Ex. 12). Cingular also had a Code of Business Conduct policy. (Muhonen Dep. Ex. 35). That policy prohibited discrimination, prohibited threats, harassment and intimidation in the workplace, and required proper use of company computer systems. (*Id.*). All of these polices provided that a violation of the policy could result in discipline up to and including termination. (Muhonen Dep. Ex. 10-13).

Cingular also had a Progressive Discipline for NonManagement Employee Policy. (Muhonen Dep. Ex. 17). That policy stated in relevant part:

> The progressive disciplinary procedure is generally reserved for job performance or attendance matters . . . Acts of misconduct, failure to follow [Cingular] policies and Code of Business Conduct violations . . . are subject to immediate discipline, up to and including discharge. When an offense by an employee is of a serious nature, suspension or dismissal may be exercised at the first offense without prior counseling or warning.

(*Id.*).

C.     **Muhonen's Transition to Offline Work**

Early in her tenure with Cingular, Muhonen answered calls from customers. (Muhonen Dep. at 129). In early April 2006, a co-worker reported an incident to management suggesting Muhonen was swearing during a customer call. (Muhonen Dep. Ex. 16). Later that month, Muhonen's psychologist prepared a letter asking that Muhonen receive a work accommodation for her Posttraumatic Stress Disorder (PTSD) to allow her to work offline and not work on the phones. (Muhonen Dep. Ex. 22). On August 28, 2006, the psychologist filled out a Cingular form that documented Muhonen's request for an accommodation. (Muhonen Dep. Ex. 22). It is not clear if Muhonen asked for the accommodation because of the incident in early April 2006, but Cingular granted Muhonen's request on September 9, 2006, effective until September 2008.

(Muhonen Dep. 141-42; Muhonen Dep. Ex. 23).   Thereafter, Muhonen worked off-line on a paperwork team.  (*Id.*).

### D.    History Of Muhonen's Discipline

Cingular contends that Muhonen had a history of discipline throughout her employment, including counseling and warnings for insubordination and inappropriate communications with coworkers and supervisors.  This Court will summarize the most relevant discipline.

Muhonen was disciplined for attendance issues in May and July 2006.  (Muhonen Dep. Ex. 19-21).  Muhonen was given written warnings about attendance on May 8 and May 31, 2007 for incidents occurring between November 7, 2006 to May 25, 2007.  (Muhonen Ex. 25-26). Because of these warnings, Muhonen was removed from the team designated to provide assistance to other customer service representatives, known as "Rep Assist" team.  (Muhonen Dep. 145; Muhonen Dep. Ex. 25-28).  Muhonen was then transferred to a team that addressed telephone orders that were lost during shipment.  (Muhonen Dep. 145-48; Muhonen Dep. 27-28).

Muhonen continued to have attendance problems and was given final written warnings on July 12, 2007 and August 28, 2007.  (Muhonen Dep. 149, 155; Muhonen Dep. Ex. 29, 32).

Muhonen was given a written warning for violating the Code of Business Conduct on September 19, 2007, because she used another employee's computer to log into the Kronos timekeeping system.[3]  (Muhonen Dep. Ex. 33).  Muhonen disputed that she should have been disciplined for the conduct because she alleged that other employees engaged in the same behaviors.  (Muhonen Dep. at 156).

After Cingular removed Muhonen from the Rep Assist team, on October 3, 2007, Team Leader Jim Davis noticed Muhonen spending an extended period of time assisting a customer

---

[3]  Muhonen filed a grievance over this incident as well as an incident with her then-supervisor Leora McFarthing.  Muhonen appealed those grievances to the National Labor Relations Board.  (Muhonen Aff. Ex. A at 8-9).

service representative from another team.  (Muhonen Dep. Ex. 40).  Davis emailed Muhonen's

Team Leader, Jason Vork, asking him to remind Muhonen she was no longer on the Rep Assist

team.  (*Id.*).  After Vork forwarded the email to Muhonen, she then forwarded the email to her

co-workers complaining, "I had no idea [Davis] was so serious about getting me off and

KEEPING me off the team!"  (Muhonen Dep. Ex. 40, (emphasis in original)).  Muhonen also

forwarded co-workers another email from management that stated Davis was acting "petty" and

"hitting below the belt."  (*Id.*).  Despite being told not to continue helping other employees,

Muhonen stated in the email she would continue to be available to assist other customer service

representatives.  (Muhonen Dep. Ex. 41).  Cingular gave Muhonen a final written warning for

violating the Code of Business Conduct in relation to the broadcast emails criticizing

supervisors.  (*Id.*).  The warning stated, "[t]his type of open criticism and refusal to follow the

direct orders of management is insubordinate conduct."  (*Id.*).

On March 7, 2008, Muhonen was disciplined for discussions and interactions with her

team manager, Phil Doron.  On that date, Muhonen asked Doron for permission to leave work

during her shift (but outside of her scheduled lunch break) to get food to eat with medications.

(Muhonen Dep. at 187-90; Muhonen Dep. Ex. 9).  After Muhonen and Doron discussed the

issue, Muhonen abruptly left in the middle of the meeting to get a union steward involved.  (*Id.*).

After the union steward got involved, Doron gave Muhonen permission to leave work to get

food.  (*Id.*).  Later that day, Doron asked Muhonen into a conference room to counsel her on her

behavior in the previous discussions.  He explained that her "recent behavior leading up to this is

eroding my capability to manage the team properly, her blatantly ignoring me while I am trying

to give her instructions I feel is very disrespectful to me as a person and to the position I hold as

team manager."  (*Id.*).  Muhonen again left in the middle of the meeting.  (*Id.*).  When she

returned, Doron explained that her actions in abruptly leaving in the middle of the meetings were examples of her disrespectful, rude, and insubordinate conduct. (*Id.*). Again Muhonen left the conference room in the middle of the meeting, stating "[it's] 5:00 pm and I am going home." (*Id.*). A few days later, Muhonen sent an email to Doron apologizing for her actions in the meeting. (Muhonen Dep. at 193-96; Muhonen Dep. Ex. 50).

### E.   ADA Accommodation in 2008

In July 2008, Muhonen told Safinaz Farid that she had previously been granted an ADA accommodation to be off the phones because of her PTSD. (Muhonen Aff. Ex. J at 6). Muhonen asked Farid to advise her if her ADA paperwork needed updating. (*Id.*). At first Human Resources was unable to locate Muhonen's previous ADA paperwork and suggested she did not have any accommodations. (*Id.*). After Muhonen insisted she had been granted an accommodation, her ADA paperwork was ultimately located in mid-July. (*Id.* at 4-6). Because her previous accommodation was only granted for two years, Cingular then made plans to have Muhonen "recertify" her need for an accommodation. (*Id.*).

### F.   Cell Phone Incident

The Parties present competing factual versions of what happened on the afternoon of August 7, 2008, which the Parties alternately refer to as "the cell phone incident" or the "assault." As set forth in this Court's analysis, however, the factual disputes with respect to the cell phone incident are legally immaterial.

In the summer of 2008, Nancy Heineman became Muhonen's supervisor on the Enrollments Team. (Muhonen Dep. at 89-90). Heineman reported to Area Manager Ted Osborn, who reported to Associate Site Director Jason Iwasko. (*Id.* at 90).

In the afternoon of August 5, 2008, Muhonen approached Heineman to discuss several team issues, including a perception on the team that Heineman favored an employee named Meghan McReynolds and dissent about the process for recording individual enrolment statistics. (Muhonen Dep. at 206-08; Muhonen Dep. Ex. 52).  Later, McReynolds told Heineman she felt she was being harassed by the team.  (Heineman Decl. ¶ 3).  The next morning, August 6, 2008, Heineman approached Osborn about the issues Muhonen raised.  (*Id.*).  Based on direction from Osborn, Heineman held a team meeting later that day regarding the issues.  (Muhonen Dep. Ex. 52).

Employees on the team continued to have concerns about their perception that Heineman showed favoritism to McReynolds.  On August 7, 2008, Heineman approached a group of employees, including Muhonen, who were discussing McReynolds and other team issues. (Heineman Decl. ¶ 3-4).  Heineman and Muhonen dispute what happened next.  Heineman alleges that the employees requested a meeting with her and the rest of the team, which Heineman agreed to call once the group prepared an agenda.  (*Id.*).  During the discussion, Muhonen stated that McReynolds called Heineman at night to report on what the team was doing.  (Heineman Decl. ¶ 3).  At first, Heineman denied that McReynolds called her.  (*Id.*). Heineman then corrected herself and stated McReynolds called her one time, at Heineman's request, regarding whether Heineman needed to bring bagels to work the next morning as a reward for the team meeting production goals.  (*Id.*).  Heineman requested McReynolds make the call because she was scheduled to work until 7:15 p.m. and therefore would know if the team met the production goal.  (*Id.*).  Heineman asserts that as she was explaining this to Muhonen:

> I tossed my cell phone in Ms. Muhonen's direction and told her that she could check my phone to verify what I was telling her. The cell phone slipped out of my hand as I was tossing it and it landed on Ms. Muhonen's desk.  I apologized right away to Ms.

Muhonen as I had not intended the terrible toss.  I had absolutely
no intention to harm Ms. Muhonen or to frighten her.

(*Id.*).

Muhonen's version of the cell phone incident is different.  Muhonen states that when she brought McReynolds up, Heineman's face got red and she got angry.  (Muhonen Dep. Ex. 54).  Muhonen also states that Heineman did not "toss" the phone but rather she "threw it over 60 miles per hour directly at [Muhonen's] head."  (Muhonen Dep. at 213-14).  Also, Muhonen denies that Heineman stated it was a terrible toss, but admits Heineman apologized immediately after the incident.  (Muhonen Dep. at 215).

Muhonen reported the cell phone incident to the police, but charges were not filed because the phone did not hit Muhonen.  (Muhonen Dep. at 225, 227; Muhonen Aff. Ex. A at 4-6).  Muhonen filed a Statement of Occurrence with the union and gave it to Robert Mayfield, a union steward at that time.  (Muhonen Dep. at 218-19; Muhonen Dep. Ex. 54).  Muhonen also reported the incident to area manager Robert Williams.  (Muhonen Aff. Ex. A at 2-3).

## G.    Company Response to the Cell Phone Incident

After the cell phone incident, management representatives interviewed the entire team, including Muhonen.[4]  (Muhonen Dep. at 227-28; Osborn Decl. at ¶ 2).  After the interviews, Osborn and Iwasko reviewed the information with Human Resources Manager Charlotte Ellison.  (Osborn Decl. at 9).  Because the information from the witnesses varied and because "the great weight of the evidence that [Cingular] received indicated that there was no intent by Ms. Heineman to harm Ms. Muhonen" the company concluded that the appropriate resolution was to verbally counsel Heineman regarding her actions.  (Osborn Decl. at ¶9; Heineman Decl. at ¶ 4).

---

[4]    Osborn's notes from his discussion with Muhonen suggest that she stated the cell phone incident didn't involve the union.  (Muhonen Dep. Ex. 9).  Muhonen denies making such a statement.  (Muhonen Dep. at 230-31).

Osborn met with Heineman and discussed professional and effective ways for her to respond to employee situations.   (*Id.*).   After the investigation, Osborn met with the customer service representatives on the team and informed them the investigation was concluded, that the issues had been addressed, and directed the team to focus on work assignments and productivity. (Osborn Decl. ¶ 11).

Muhonen asserts that working under Heineman after the alleged assault exacerbated and "triggered" her PTSD, "every day" and "constantly."  (Muhonen Aff. at at 3).  Because she was afraid of Heineman, Muhonen alleges she asked Cingular and the union to remove her from Heineman's team after the incident.   (Pl. Leanda Muhonen's Mem. of Law in Opp. to Def. [Cingular's] Mot. for Summ. J. at 1, hereinafter "Pl.'s Cingular Br." at p. 8).   Muhonen did not substantiate or prove her request with emails, letters or other documents showing that she requested Cingular or the union move her to another team or remove her from working with Heineman.   Nor did Muhonen state in her Affidavit that she made such a request.   In contrast, Cingular's witnesses all stated they never received a request from Muhonen to be moved off Heineman's team.   (Iwasko Aff. at ¶ 16; Osborn Decl. at ¶ 30; Ellison Aff. at ¶ 12)

Even after the cell phone incident, on August 19, 2008, Muhonen sent Heineman a friendly email after a stressful day stating, "[h]ave a glass of good red wine tonight!   ☺ and relax, we'll get this function running smoothly in no time!"  (Muhonen Dep. at 241-42; Muhonen Dep. Ex. 59).   Muhonen contended in her deposition that she was only being supportive in the email, not that she had good feelings towards Heineman.   (Muhonen Dep. at 242).

### H.   <u>Union Response to Cell Phone Incident</u>

After Muhonen provided Mayfield with the Statement of Occurrence for the cell phone incident, Mayfield emailed Muhonen that he had given the Statement of Occurrence to another

steward, John Mulloy to take to Local 7200's offices.  (Muhonen Dep. at 327-28; Muhonen Aff. Ex. A at 7).  Muhonen was friends with Mulloy and she did not think he would try to hurt her. (Muhonen Dep. at 327).

Mulloy did not provide the Statement of Occurrence to Danley at the Local 7200 offices, as required to initiate a grievance, until the October 2008 membership meeting, more than thirty days after the incident.  (Danley Decl. at ¶ 21).  At her deposition, Muhonen testified that Mulloy's failure to get the Statement of Occurrence to the union within thirty days was "negligent," and a screw-up, but that Mulloy was not trying to hurt Muhonen.  (Muhonen Dep. at 328-29).  Because more than thirty days had passed, a grievance would have been untimely under the CBA and therefore, Danley did not file Muhonen's cell phone grievance.  (*Id.*). Danley also did not file the grievance because "even if the union could prove that supervisor Heineman 'assaulted' Ms. Muhonen with a cell phone, this would not violate the [CBA] and there was no remedy available under the [CBA]."  (Danley Decl. at ¶ 22).  Muhonen did not lose any pay or benefits as a result of the cell phone incident.  (Danley Decl. at ¶ 23; Muhonen Dep. at 334).  Muhonen asserted that she wanted to be moved off Heineman's team because of the alleged assault.  (Muhonen Dep. at 333-34).  Muhonen conceded that the CBA did not provide any right for the union to transfer Muhonen to another team or department.  (Muhonen Dep. at 334; *see also* Danley Decl. at ¶ 23).

By the end of September, Muhonen had not seen a grievance from the union, even though more than thirty days had passed since the incident.  (Muhonen Dep. at 333).  At that time she was "leaning" towards the conclusion that the union had not filed a grievance on her behalf. (*Id.*).  By the end of October, Muhonen concluded the union was not going to do anything about the cell phone incident.  (*Id.*).

I.      **Subsequent Documentation of Muhonen's Behavior**

Between the cell phone incident and Muhonen's termination, Cingular documented a number of incidents in which Muhonen was insubordinate or behaved unprofessionally. The Court summarizes these incidents below.

On September 12, 2008, Heineman disciplined Muhonen for an incident Cingular considered another example of Muhonen's "disruptive and counter-productive behavior in the workplace," after Muhonen questioned and disagreed with Heineman's directives during a team meeting. (Heineman Decl. at ¶ 6). Heineman again counseled Muhonen, on September 29, 2008, for an inappropriate email she sent to another employee suggesting the employee was not doing his job. (Heineman Decl. at ¶ 7; Muhonen Dep. Ex. 62). Muhonen forwarded that email to another employee criticizing the customer referenced in the email and arguing she should not have been given negative feedback over the incident. (*Id.*). After viewing these emails, Heineman counseled Muhonen to maintain professionalism in her communications. (Heineman Decl. at ¶ 7).

Two months later, on November 17, 2008, two employees, Amy Wahman and McReynolds, raised concerns to Heineman about Muhonen's behavior. (Heineman Decl. at ¶ 8). Wahman told Heineman that Muhonen "tended to instigate others on the team and that [Muhonen] . . . had a negative attitude." (*Id.*). Wahman further stated that Muhonen had been complaining about someone "snitching" about a sign Muhonen put up in her cube "in an apparent effort to mock [Heineman]." (*Id.*). In a meeting about Muhonen with Heineman and Osborn, Wahman asserted, "[Muhonen] is always talking about snitches." (*Id.*; Muhonen Dep. Ex. 9). She further stated that while she did not feel personally harassed, the team was being harassed. (*Id.*). Wahman continued that she was "always wondering what is going to happen

next.  It is very uncomfortable when [Muhonen] is here.  [Wahman] wonders what drama is next

. . . when [Muhonen] isn't here you don't have to worry about anything.  The team gets along

and everything seems fine." (*Id.*).  McReynolds reported to Heineman and Osborn that Muhonen

told other team members what to do, reported to the team that McReynolds got another employee

fired, and told other employees that McReynolds was getting special privileges.    (*Id.*).

McReynolds also stated "[Muhonen] frequently says 'snitch[es] get stiches.'" and McReynolds

felt that statement was a threat.  (*Id.*).  In her deposition, Muhonen denied saying "snitches get

stiches," but admitted typing the phrase.  (Muhonen Dep. at 264-65).  Muhonen was not coached

or disciplined after any of these discussions.  (Muhonen Dep. at 263-64).

On December 12, 2008, Muhonen approached Heineman with a question about a work

issue and then disagreed with Heineman's response.  (Heineman Decl. ¶ 9; Muhonen Dep. Ex.

9).  Muhonen then sent an email to Iwasko complaining about Heineman.  (Muhonen Dep. 269-

70, Muhonen Dep. Ex. 69).  Muhonen stated that Heineman "cries on the floor really loud to the

team, and she gives special treatment to people on th[e] team . . . Can we meet to discuss some of

these issues before it gets out of hand?  She is starting to Harass [sic] [me and other employees]."

(Muhonen Dep. Ex. 69).  Iwasko responded that he had also heard about issues in Muhonen's

area, but that the reports he received painted a "very different picture." (*Id.*).  He told Muhonen

he would look into it and speak with Osborn.  (*Id.*).

**J.**     **Letter From Muhonen's Counselor**

On November 26, 2008, Muhonen's psychiatrist, Dr. Paul Warner, wrote a letter

addressed "To Whom It May Concern." (Muhonen Aff. Ex. M at 1).  In the letter, Dr. Warner

noted that he was treating Muhonen for severe anxiety and panic attacks and the last time he had

seen Muhonen was on September 3, 2008.  (*Id.*).  Dr. Warner asserted that Muhonen's symptoms were "incapacitating" and:

> this was, at least in part, due to an incident which she reported at work when her manager threw a cell phone at her.  This incident resulted in an increase in her Post Traumatic Stress symptoms . . . and she therefore has need to avoid situations which would result in increased anxiety and panic attacks.  She was incapacitated from work with these symptoms.

(*Id.*).  Dr. Warner did not specifically state that Muhonen needed to be removed from working with Heineman.  (*Id.*).

**K.    Events Leading to Muhonen's Termination**

On December 15, 2008, Heineman spoke to Muhonen regarding an error Muhonen made. (Heineman Decl. at ¶ 10).  Heineman explained that she expected Muhonen to partner with other teams in the organization to provide the highest quality, productivity, and percentage of completions.  (*Id.*; Muhonen Dep. Ex. 70).  Heineman went on to state that she was concerned that because of the economy, Cingular might not need 23 customer service representatives in the enrollments team.  (*Id.*).  Muhonen interrupted Heineman and claimed she was threatening Muhonen's job.  (*Id.*).  While Heineman tried to explain that Muhonen's job was not in jeopardy, Muhonen stated she was going to get a union steward.  (*Id.*).  Muhonen then returned with Robert Mayfield.  (*Id.*).  Heineman reiterated that she was not threatening Muhonen's job and apologized for any misunderstanding.  (*Id.*).  Muhonen responded by stating she was being paranoid because of an email regarding job layoffs.  (*Id.*).

Later that day, Heineman was at the desk of another team member, Dave Keller, and she heard loud music from Muhonen's desk.  (Heineman Decl. at ¶ 11).  Heineman asked Muhonen to turn down her music.  (*Id.*).  Muhonen stated she would not turn down her music unless Heineman told other team members to stop talking.  (*Id.*).  Muhonen then sent an email to

Osborn asking him to speak to Heineman about the excessive talking on the team. (Muhonen Dep. Ex. 72). A few minutes later, Muhonen emailed Keller stating, "[y]ou snitched! I thought you were better than that." (Muhonen Dep. Ex. 73). Keller forwarded the email to Osborn. (*Id.*). In her deposition, Muhonen could not recall what she thought Keller "snitched" about. (Muhonen Dep. at 280).

Approximately, one half hour later, Heineman went to Muhonen's desk after noticing she was not logged in. (Heineman Decl. at ¶ 11; Muhonen Dep. Ex. 70). The two began discussing the work error from earlier that day. (*Id.*). Muhonen raised her voice and became angry. (*Id.*). Ultimately she told Heineman to get away from her desk. (*Id.*). An intern in the area, Jennifer Lattery, overheard the exchange and stated, "[t]he attitude [Muhonen] had during the whole encounter was definite insubordination. The tone of her voice sounded threatening and scared me. I was shocked to realize that she was actually speaking to her manager." (Muhonen Dep. Ex. 74).

Thereafter, Heineman provided a detailed summary of her version of the events that occurred on December 15, 2008 to Osborn. (Heineman Decl. at ¶ 11-12; Muhonen Dep. Ex. 70). Osborn's investigation involved a review of Heineman's and Muhonen's statements, together with interviews of team members and other managers who witnessed the events. (Osborn Decl. ¶ 15-19, 22; Muhonen Dep. Ex. 9). Osborn prepared a Quick Investigative report into Muhonen's behavior. (Muhonen Dep. Ex. 9). On December 16, Osborn interviewed four of Muhonen's team members, and three considered Muhonen's conduct to be intimidating. (Osborn Decl. at ¶ 19; Muhonen Dep. Ex. 9).[5] Bridgette Yant reported that "[Muhonen] is out of

---

[5] Muhonen objects to the Court considering the statements of the other employees as reported in Osborn's Investigative report, arguing that Cingular was required to provide affidavits or declarations directly from the employees. The Court understands Muhonen to be objecting to these statements as hearsay. The witness statements included in Osborn's

control . . . There is much tension between [Muhonen and Heineman].  [Muhonen] doesn't take positive or negative feedback from [Heineman].  [Muhonen] has yelled at [Heineman] more than once.  It's uncomfortable for me and anything [Heineman] says to [Muhonen] seems to blow up."  (Muhonen Dep. Ex. 9).  Keller told Osborn, "[Muhonen] yells at [Heineman] and blows things out of proportion."  (*Id.*).  Alena Hubacher stated "everyone is afraid of [Muhonen].  She threatens union things or often says [she is] going to tell or go get Jason Iwasko."  (*Id.*).  After Osborn spoke to these employees, Muhonen sent them an email on December 16, 2008, stating "Since you guys all went in to talk to ted [sic], if I get some kind of discipline for this thing with [Heineman], I swear to God I am airing EVERYONE ON THIS SNITCHING TEAM'S DIRTY LAUNDRY!!"  (Muhonen Dep. Ex. 76) (emphasis in original).

On December 17, 2008, Osborn and area manager Dave Peterson interviewed Muhonen with a union steward, John Mulloy, also present.  (Muhonen Dep. Ex. 9; Osborn Decl. ¶ 20-22).

investigative report and other personnel documents are not hearsay, however, because they are not offered for the truth of the matter asserted.  *Wolff v. Brown*, 128 F.3d 682, 685 (8th Cir. 1997) (holding internal documents relied upon by an employer in making an employment decision are not hearsay under Fed. R. Evid. 801(c), but rather are relevant to explain employer's conduct); *Hudspeth v. Spectra Communications Grp., LLC*, No. 03-1610, 83 Fed. Appx. 145, 146, 2003 WL 22955855, *1 (8th Cir. Dec. 12, 2003) (same).

Even if the statements were offered as proof of the matter asserted, the statements fall within hearsay exceptions.  The statements report how employees felt about Muhonen's behavior and fall within Fed. R. Evid. 803(3) as a statement of the declarant's then existing state of mind, emotion, or mental feeling.  The inclusion of the statements in the investigative report is also not hearsay because it is a business record of regularly conducted activity under Fed. R. Evid. 803(6); *E.E.O.C. v. HBE Corp.*, 135 F.3d 543, 553 (8th Cir. 1998) (documents kept in employee files were records of regularly conduced activity under Rule 803(6)); *Wolff*, 128 F.3d at 685 (holding internal memoranda prepared by employees in the regular course of business were not hearsay under Rule 803(6)).

Muhonen also suggests these witness statements are fabrications that were created after this case began because the statements were not recorded in Cingular's Personnel Development Tracking System (PDTS).  (Pl.'s Cingular Br. at 26).  Muhonen has not offered any evidence to support this allegation, other than her conjecture that because employees tracked "everything" in PDTS, the witnesses statements should have been in the system.  Further, the statements are evidenced by contemporaneous emails, which negate the argument that the documents were created after the fact.  (*See, e.g.,* Muhonen Ex. 52, 58, 64, 65, 70).  Nothing in the record supports Muhonen's suggestion that the witness statements were fabricated.

When confronted with the "snitching" email, Muhonen asserted that other employees also sent inappropriate emails.  (*Id.*).  When Osborn stated that Muhonen should not be loud and should act appropriately, Muhonen replied that other team members were loud as well.  (*Id.*).  During the interview, Muhonen also stated "I would like [Heineman] to back off . . . you should be addressing everyone and not just me."  (*Id.*).

At the end of his investigation and after consultation with Human Resources and Iwasko, on some date between December 18 and December 22, 2008, Osborn recommended that Muhonen be terminated because she intimidated the team and created a hostile working environment, was a distraction to the team and others, and was harassing to her manager. (Muhonen Dep. Ex. 9; Osborn Decl. at ¶ 22; Ellison Decl. at ¶ 7-8; Iwasko Aff. at ¶ 14).  Osborn concluded Muhonen's behavior amounted to "performance-related misconduct, in violation of the Company's policies."  (Osborn Decl. at ¶ 22).  Osborn then obtained the appropriate review and approval for the termination from human resources and in-house counsel.  (Osborn Decl. at ¶ 26; Ellison Aff. at ¶ 9; Heineman Aff. ¶ 13).  The actual termination was also delayed because of the intervening Christmas and New Year's holidays.  (Ellison Aff. at ¶ 9).

On January 20, 2009, Heineman and Williams met with Muhonen in a conference room, along with union steward Cheryl Svitak.  (Muhonen Dep. at 292-93).  Heineman then terminated Muhonen.  (Muhonen Dep. at 293).  Muhonen contends that Heineman refused to give her a reason for her termination.  (*Id.*).

**L.**     **The Union's Response to Muhonen's Termination**

On or about January 28, 2009, Mayfield sent Muhonen a letter stating that if she wished to pursue a grievance for her termination, she should notify him by February 11, 2009.

(Muhonen Dep. Ex. 80, at B; Muhonen Dep. at 338-39).   Muhonen never contacted Mayfield. (Muhonen Dep. at 342).

The parties dispute whether Muhonen asked Danley for the paperwork necessary to file a grievance.   Regardless, there is no dispute that Muhonen did not pursue or file a grievance. Muhonen admits that she never filled out a Statement of Occurrence for her termination. (Muhonen Dep. at 338, 342; Muhonen Dep. Ex. 80).   Muhonen did not pursue a grievance because she thought it would be useless and because she thought she could not file a grievance because the CBA had expired.   (*Id.*).   Because Muhonen did not file a Statement of Occurrence, neither Danley nor Mayfield filed a grievance on Muhonen's behalf.   (Danley Decl. ¶ 24).

## II.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56;[6] *Myers v. Lutsen Mountains Corp.*, 587 F.3d 891, 893 (8th Cir. 2009).   The burden is on the moving party to show that the entry of summary judgment is appropriate.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).   If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," then Rule 56 requires the entry of summary judgment in favor of the moving party.   *Id.* at 322-23.   All evidence will be viewed in the light most favorable to the nonmoving party.   *Vette Co. v. Aetna Cas. & Sur. Co.,* 612 F.2d 1076, 1077 (8th Cir. 1980).

---

[6] The Defendants filed their motions **before** Federal Rule of Civil Procedure 56 was amended on December 1, 2010.   Even if the amended Rule applied, the substantive standard for granting summary judgment did not change.   *See* Fed. R. Civ. P. 56, advisory committee's note, 2010.

III.   **DISCUSSION**

Section 301(a) of the Labor Management Relations Act (LMRA) authorizes "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined by this Act, or between any such labor organizations." 29 U.S.C. § 185(a); *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).   An employee can bring a "hybrid" § 301 action.   *Miner*, 513 F.3d at 860.   As stated earlier, in a hybrid action, the employee must show **both** that the employer breached the terms of the CBA and that the union breached its duty of fair representation under the CBA.   *Id.* (citing *Scott v. United Auto Workers*, 242 F.3d 837, 839 (8th Cir.2001)); *Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 994 (8th Cir. 2006).

A.   **Local 7200 Did Not Breach Its Duty of Fair Representation**

A union breaches its duty of fair representation only when its conduct toward a union member is arbitrary, discriminatory, in bad faith, or so unreasonable as to be irrational.   *Vaca v. Sipes*, 386 U.S. 171, 186-87 (1967); *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 78 (1991); *Waldron v. Boeing Co.*, 388 F.3d 591, 594 (8th Cir. 2004).   If the union's actions are mere negligence, poor judgment, or ineptitude, the union has not breached its duty of fair representation.   *Jones*, 461 F.3d at 994.   "Any substantive examination of a union's performance . . . must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." *Air Line Pilots,* 499 U.S. at 78; *Thompson v. United Transp. Union*, 588 F.3d 568, 572 (8th Cir. 2009).   "Under this standard, plaintiffs have a substantial burden to survive a motion for summary judgment." *Thompson*, 588 F.3d at 572.

A union's conduct is considered arbitrary if, considering all the circumstances at the time of the union's action or inaction, "the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Cross v. United Auto Workers, Local 1762*, 450 F.3d 844, 847 (8th Cir. 2006) (citing *Smith v. United Parcel Service, Inc.,* 96 F.3d 1066, 1068-69 (8th Cir. 1996)). A union's actions are considered discriminatory if the union fails to serve "the interests of all members without hostility or discrimination toward any." *Vaca*, 386 U.S. at 177, *cited in Thompson v. United Transp. Union*, 588 F.3d 568, 572 (8th Cir. 2009). A showing of bad faith requires proof of "fraud, deceitful action, or dishonest conduct." *Gaston v. Teamsters Local 600*, 614 F.3d 774, 778 (8th Cir. 2010) (citing *Smith*, 96 F.3d at 1068).

A plaintiff pursuing an action for breach of the duty of fair representation must also establish that he or she was harmed or prejudiced by the union's act or omission. *See Matthews v. Milwaukee Area Local Postal Workers Union*, 495 F.3d 438, 441 (7th Cir. 2007); *Garcia v. Zenith Electronics Corp.*, 58 F.3d 1171, 1176-77 (7th Cir. 1995); *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 585 (6th Cir. 1994); *see also Baxter v. United Paperworkers Int'l Union, Local 7370*, 140 F.3d 745, 748 (8th Cir. 1998) (noting harm to plaintiff in breach of duty of fair representation was merely speculative); *Thomas v. Bakery, Confectionery and Tobacco Workers Union Local No. 433*, 826 F.2d 755, 764 (8th Cir. 1987) (approving jury instruction requiring plaintiff to prove prejudice from the breach in a duty of fair representation claim).

### 1. Cell Phone Incident

Local 7200 argues that it should be granted summary judgment on Muhonen's claim that the union breached the duty of fair representation by failing to file a grievance over the cell phone incident for three reasons: (1) the claim is barred by the statute of limitations; (2) the

union's failure to file a grievance was mere negligence; and (3) the failure to file the claim did not harm Muhonen.  This Court agrees.

### i.      The Claim Is Time Barred

The statute of limitations for bringing a fair representation claim is six months.  *Scott v. United Auto. Workers*, 242 F.3d 837, 839 (8th Cir. 2001).  The statute of limitations begins to run when the employee knows or reasonably should have known of the union's alleged breach of the duty of fair representation.  *Id.* (citing *Evans v. Northwest Airlines, Inc.,* 29 F.3d 438, 441 (8th Cir.1994)); *Bigalke v. State of Minn. Dept. of Veterans Affairs*, No. 10-212, 2010 WL 3702597, *6 (D. Minn. Aug. 10, 2010).

The cell phone incident occurred on August 7, 2008.  Under the CBA, the union had until September 6, 2008, thirty days from the incident, to file the grievance.  Thus, the alleged breach of the duty of fair representation occurred on September 6, 2008.  At her deposition, Muhonen acknowledged that by the end of October she knew the union was not pursuing a grievance.[7] Thus, the statute of limitations began to run at the end of October, giving Muhonen until the end of April to file her Complaint.  Muhonen did not file her Complaint against the union until May 9, 2009, more than six months after she knew of the union alleged breach.  The claim is therefore untimely.

---

[7]      At oral argument, Muhonen suggested that while she knew that the union was not pursuing a grievance in October 2008, she did not know until after the case was filed the reason that the union did not pursue a grievance, i.e., that Mulloy did not deliver the Statement of Occurrence to Danley until October.  But the issue is when Muhonen reasonably knew that the union had allegedly breached its duty, not the cause of the breach.

### ii.    The Union's Actions Were Merely Negligent

At her deposition, Muhonen conceded that Mulloy's failure to get the Statement of Occurrence to the union within thirty days was "negligent," and a screw-up.[8]  (Muhonen Dep. at 328-29).  Muhonen also conceded that Mulloy was not acting with an intent to harm Muhonen specifically.  The law is clear that mere negligence or ineptitude does not amount to a breach of the duty of fair representation.  *Gaston*, 614 F.3d at 778.  The failure to timely deliver the Statement of Occurrence is certainly not "so far outside the wide range of reasonableness as to be irrational."  Nor is there any evidence in the record of bad faith or discriminatory motive.  Summary Judgment is therefore appropriate on this claim.

### iii.    Muhonen Was Not Harmed

Summary judgment should also be granted to Local 7200 because there is no evidence that the union's failure to file a grievance over the cell phone incident resulted in a reparable harm to Muhonen.  It is undisputed that Muhonen did not lose pay or benefits as a result of the alleged assault.  (Muhonen Dep. at 334).  Muhonen testified that the remedy she sought from the union over the cell phone incident was a transfer away from Heineman's team.  (*Id.*).  Muhonen acknowledged, however, that the CBA did not provide a contractual remedy to move Muhonen to another team.  Therefore, even if the union pursued the grievance and arbitrated the claim, the outcome of the arbitration would not have resulted in Muhonen's transfer to another position.  Muhonen also asserts that the "harm" she suffered is emotional distress.  Emotional distress damages, however, are not available in ordinary duty of fair representation claims based on the union's failure to file a grievance.  *Richardson v. Communications Workers of Am.*, 443 F.2d

---

[8] In her response brief, Muhonen appears to contend that the union should have pursued a grievance even without receiving the Statement of Occurrence because "everyone" including Mayfield and Danley, knew about the cell phone incident.  But Muhonen offers no evidence in support of this assertion.

974, 982 (8th Cir. 1971).  Summary judgment should be granted to Local 7200 with respect to the cell phone incident.

### 2.  Termination

Local 7200 argues that it is also entitled to summary judgment with respect to Muhonen's claim that it breached its duty of fair representation when it failed to pursue a grievance for Muhonen's termination; Muhonen makes this claim even though she admits she did not ask to grieve her termination.

Several circuits and other courts have concluded that a plaintiff may not succeed on a breach of fair representation claim where the plaintiff does not demonstrate that he or she affirmatively requested the union to pursue a grievance.  *See Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1178 (7th Cir. 1987); *see also Flanigan v. Int'l Bhd. of Teamsters, Local 671*, 942 F.2d 824, 829 (2d Cir. 1991); *Mullins v. Int'l Union of Operating Engineers, Local No. 77*, 214 F. Supp. 2d 655, 664 (E.D. Va. 2002); *Wright v. Safeway, Inc.*, 804 F. Supp. 752, 755 (D. Md. 1992).  "If a worker doesn't even ask his union to press a grievance for him he can hardly complain that it has failed to represent him."  *Mechmet*, 825 F.2d at 1178.  Although the Eighth Circuit does not appear to have addressed this issue, the rule articulated in *Mechmet* and other cases is logical.

While there is a fact dispute in the record concerning whether Muhonen asked Danley for the paperwork to file a grievance,[9] it is undisputed that Muhonen never provided the union with a Statement of Occurrence or asked anyone to file a grievance on her behalf.  (Muhonen Dep. at 338).  It is likewise undisputed that Muhonen never responded to Mayfield's letter asking her to

---

[9] The union essentially argues that this Court should not believe Muhonen's statement that she asked Danley for the paperwork to file a grievance.  This Court, however, cannot make such a credibility determination at the summary judgment stage.  *Torgerson v. City of Rochester*, 605 F.3d 584, 599 (8th Cir. 2010).

contact him if she wanted to pursue a grievance.  (Muhonen Dep. at 342).  Further, in the state court Complaint Muhonen filed against Cingular, she affirmatively stated she chose not to go to the union office to pursue a grievance after her termination.  (Muhonen Dep. Ex. 80 ¶ 66). Because Muhonen never pursued a grievance, her breach of the duty of fair representation claim fails.  Therefore, this Court recommends that Local 7200's motion be granted.

### B.   Cingular Did Not Breach the CBA

Because Muhonen's claim against the union fails, her hybrid § 301 claim against Cingular fails as well.  Even if this Court considers the merits of Muhonen's breach of contract claims against Cingular, however, summary judgment should be granted.

#### 1.  Cell Phone Incident

Muhonen asserts that Cingular breached the CBA after the cell phone incident because Cingular did not respond to the incident by removing Muhonen from Heineman's team.[10] Cingular asserts that summary judgment is appropriate on this claim because there is no contractual provision in the CBA that it violated in connection to the cell phone incident.  This Court agrees.

In her initial brief, Muhonen asserted that Cingular breached the CBA by not providing her with a "safe work environment" under Article 16 and by not accommodating her disability by transferring her away from Heineman.  (Pl.'s Cingular Br. at 3-4).  Muhonen later filed a brief

---

[10]   Muhonen has suggested that Cingular has taken contradictory positions with respect to the cell phone incident.   In the First Amended Complaint, Muhonen alleged that Heineman "assaulted Ms. Muhonen with a cell phone." [Doc. No. 57 at ¶ 28].  In Cingular's Answer to the First Amended Complaint it denied this allegation [Doc. No. 58].   In the affidavits and declarations, Heineman and others acknowledge that Heineman threw or tossed the cell phone at Muhonen.   This Court cannot conclude, however, that Cingular's position in the Answer to the Amended Complaint is contradictory to the statements made in the Affidavits and Declarations. The averment in the pleading included the word "assault," which is a term of art with a specific meaning.   Cingular has maintained throughout this lawsuit that the cell phone incident was not an assault.

in response to Cingular's reply brief contradicting that position.[11] (Pl. Leanda Muhonen's Resp. Brief to Def. Cingular's Reply Br. in Supp. of Its Mot. for Summ. J.) [Doc. No. 240].  In that brief, Muhonen conceded "[t]here is nothing I can find in the agreement that requires Cingular to provide a safe [e]nvironment.  I agree with [Cingular]; there is nothing in the CBA that I can find that states that they provide a harassment free work place."  (*Id.* at 8).  This Court agrees with Muhonen's concession.  Article 16 of the CBA concerns setting up a committee to address occupational safety issues.  Nothing in that article, (or anywhere else in the CBA) provides a basis for Muhonen to file a grievance or seek a remedy from Cingular for the cell phone incident.

Muhonen also contends that Cingular violated the CBA because Cingular did not accommodate her alleged disability and move her away from Heineman's team.  (*Id.*).  This argument is unavailing as well.

First, Muhonen admitted in her deposition that there is no provision in the CBA that would have allowed Cingular to transfer Muhonen to another team,[12] and during her deposition Muhonen could not point to any provision Cingular violated in the CBA with respect to the cell phone incident.  (Muhonen Dep. at 334, 336-67).

Second, while Article 15 prohibits disability discrimination, it does not incorporate an affirmative obligation to accommodate a disability.[13]  Even if this Court accepts Muhonen's assertions that Heineman and upper management (and not just human resources employees) knew about Muhonen's PTSD,[14] there is no evidence in the record that Muhonen asked for an

---

[11]  The Court notes that Muhonen's "Response" brief is not permitted by Local Rule 7.1. The Court nonetheless considered its contents in light of Muhonen's *pro se* status.

[12]  As Cingular points out, moving Muhonen to another team could have violated the seniority provisions of the CBA.

[13]  While the Americans with Disabilities Act (ADA) prohibits disability discrimination, as set forth *infra.* at p. 33, Muhonen does not have a viable ADA claim in this case.

[14]  The Court also notes that Muhonen has the burden to establish that she suffered from an ADA-qualifying disability, but she has not produced evidence, (other than unsupported

accommodation to be transferred to another team.   Before an employer has a duty to accommodate an employee, the employee with a disability has a responsibility to inform the employer that an accommodation is needed.   *Kobus v. College of St. Scholastica, Inc.*, 608 F.3d 1034, 1038 (8th Cir. 2010) (citing *Wallin v. Minn. Dep't of Corr.*, 153 F.3d 681, 689 (8th Cir.1998)).   Although Muhonen claimed in her deposition she sent emails requesting to be moved to a different team, there are no documents or emails in this case suggesting Muhonen sought a transfer.   Nor did Muhonen attest in her Affidavit that she ever requested to be moved.

The Parties dispute which individuals received or had notice of the November 26, 2008 letter from Dr. Warner.   But this fact is irrelevant because nowhere in the letter does Dr. Warner state Muhonen needed to be transferred away from Heineman's team.   Long before the cell phone incident, Muhonen had asked for and received accommodations and medical leave from Cingular, to not work on the phones and to work four days per week.   Muhonen's diligent pursuit of these earlier requests for accommodation are documented in records and multiple emails. (Muhonen Dep. Ex. 22-23; Muhonen Aff. Ex. J).   In contrast, no documentation exists in the record suggesting Muhonen requested removal from Heineman's team after the cell phone incident as an accommodation.

Finally, after the cell phone incident there were two "express interest" opportunities where employees could express an interest to move to another team before the next formal bidding process, but Muhonen did not avail herself of these opportunities to move her position. (Osborn Decl. at 32).   Because there is no provision in the CBA that required Cingular to transfer Muhonen and she never requested a transfer regardless, Cingular's motion for summary judgment should be granted.

recitations of common PTSD symptoms), suggesting she suffered from an impairment that substantially limits one or more of major life activities.   *Norman v. Union Pacific R.R. Co.*, 606 F.3d 455, 459 (8th Cir. 2010).

### 2.  Termination

Muhonen asserts that her termination was without "just cause" and therefore violated the CBA.  Cingular asserts that it had just cause to terminate Muhonen based on her violations of the Code of Conduct and her harassing and disruptive behavior at work.

The Eighth Circuit has held that an employee's violation of an employer's policies constitutes just cause.  *Pegump v. Rockwell Int'l Corp.*, 109 F.3d 442, 445 (8th Cir. 1997).  In Pegump, the employer's handbook prohibited disruptive or offensive behavior.  *Pegump v. Rockwell Intern. Corp.*, 963 F. Supp. 1518, 1532 (S.D. Iowa 1996).  The plaintiff in that case made a joke to co-workers about bringing a gun to work and the individuals who overheard "were affected by the statements."  *Id.* at 1532-34.  On those facts, the district court noted that "[t]hreats of violence, even jokes about violent acts, may reasonably fall within the scope of [the company's handbook policy]."  *Id.* at 1532.

The undisputed facts of this case support Cingular's contention that Muhonen was terminated for "just cause."  Muhonen's personnel file documents numerous disciplinary actions, including insubordination, unprofessional conduct with customers, co-workers and management, and threats to co-workers.  Muhonen's co-workers' statements demonstrate they felt threatened.  Cingular based its decision to terminate Muhonen because of these perceived threats and harassment.  These acts violated Cingular's Code of Business Conduct and gave Cingular cause to terminate Muhonen.  Therefore, Cingular did not breach any provision of the CBA.

Muhonen asserts that this Court should deny Cingular's motion for summary judgment because Cingular has changed the reasons it has offered for her termination and therefore the reason for her termination should not be believed.  She notes that when she was terminated, Cingular did not provide her with a letter stating the reason she was fired. But Muhonen has not

asserted that she requested the reason for her termination in writing as Minn. Stat. § 181.933 requires.   In a written submission for Muhonen's unemployment application, Cingular stated Muhonen was fired for a Code of Conduct violation and creating a hostile work environment.   In an Affidavit in Support of Cingular's Motion to dismiss, Ellison stated Muhonen was terminated for "performance-related misconduct." (Ellison Aff., dated February 25, 2009 at ¶ 6) [Doc. No. 2].   Ellison's later Affidavit in support of Cingular's Motion for Summary Judgment, Ellison stated:

> Under Cingular's policies. Ms. Muhonen's conduct in this regard amounted to performance-related misconduct and violated Cingular's Code of Business Conduct.   In accordance with Cingular's practices, policy application and termination code terminology, performance-related misconduct for creating a hostile work environment is a type of misconduct that falls within the broader overall category of misconduct.

(Ellison Aff. at ¶8) [Doc. No. 178].   Finally on Cingular's internal "Employee Termination Form" the listed reasons for termination were misconduct and "created atmosphere of hostile work environment."   Muhonen's assertion that the phrase "performance-related misconduct" cannot encompass creating a hostile work environment, is a distinction without a difference.   It is clear that in each of these instances, Cingular was communicating the same thing−Muhonen was terminated because of her inappropriate communications with management and co-workers. Cingular's reasons for terminating Muhonen are consistent, even if the language used to describe those reasons is characterized as inconsistent.

Muhonen also asserts that she should not have been terminated under the Progressive Discipline Policy because her final written warning expired in October 2008, before the events in December that led to her ultimate termination.   Therefore, Muhonen alleges that the company

was required to "start over" with progressive discipline.  (Pl.'s Cingular Br. at 11-12, 23).[15]

Muhonen ignores provisions in the discipline policy that provide that an employee could be

terminated immediately for acts of misconduct, failure to follow company policies, and Code of

Business Conduct violations.  Cingular terminated Muhonen for misconduct and for Code of

Business Conduct violations, and therefore Cingular was entitled to terminate Muhonen without

progressive discipline.

Finally, Muhonen asserts that her termination violated the CBA and was not supported by

just cause because the unemployment law judge concluded she was not terminated for

misconduct and therefore was entitled to unemployment benefits.  (Pl.'s Cingular Br. at 24).  The

fact that the unemployment law judge concluded Muhonen was entitled to benefits and did not

engage in employment misconduct does not compel the conclusion that Muhonen did not engage

in misconduct under the CBA.  First, it is undisputed that Cingular, like many employers, did not

participate in the administrative unemployment hearing.  Second whether an employee was fired

for "just cause" and whether an employee engaged in misconduct for purposes of unemployment

law benefits are separate and distinct legal standards.  *Hillman v. Arkansas Highway & Transp.*

*Dept.*, 39 F.3d 197, 199 (8th Cir. 1994) (declining to apply collateral estoppel on whether

employee was fired for just cause under Veterans' Reemployment Rights Act after finding in

earlier action that termination was not based upon "misconduct" for Arkansas unemployment

compensation benefits); *Klyuch v. Freightmasters, Inc.*, No. 03-6135, 2005 WL 318786, *4 (D.

Minn. Feb. 9, 2005) (excluding evidence of testimony from unemployment hearing based on

---

[15] Muhonen also cites to a Tenth Circuit case for the proposition that an employer can only look back at nine months of discipline in terminating an employee for cause.  *Webb v. ABF Freight Sys, Inc.,* 155 F.3d 1230, 1247 (10th Cir. 1998).  But Muhonen misconstrues the holding of that case.  In *Webb*, the Court did indeed exclude evidence of the employee's prior discipline. But the basis for that exclusion was that evidence of other discipline was irrelevant because the employer affirmatively denied firing the employee for prior work incidents.  In this case, Cingular has not made such an affirmative denial.

state statute and because the standards for unemployment benefits are distinct from the standards for employment discrimination).

The undisputed evidence demonstrates Muhonen was terminated for making threatening and harassing comments to co-workers and for being insubordinate and unprofessional. These actions violated Cingular's Code of Business Conduct and constituted just cause for Muhonen's termination. Therefore, Cingular did not breach the CBA. This Court recommends that Cingular's motion for summary judgment be granted.

**C.**     **Other Miscellaneous Claims Asserted by Muhonen**

Although the only claims in Muhonen's First Amended Complaint are for violations of § 301(a) of the LMRA, in her briefs and Affidavit Muhonen appears to seek other relief based on claims not properly before this Court. Muhonen is not entitled to relief for any of these claims.

Muhonen asks this Court to reinstate a 5th degree Assault Charge against Heineman. (Muhonen Aff. at p. 4-5). Judge Susan Richard Nelson recommended dismissing the assault claim as barred by the Worker's Compensation Act exclusivity provisions [Doc. No. 55] and Judge John R. Tunheim adopted the recommendation [Doc. No. 56]. Muhonen alleges that the claim should not have been dismissed because it is a state law claim that only the state court could dismiss. Muhonen's argument fails for two reasons. First, Muhonen did not object to Judge Nelson's Report and Recommendation and has not requested the Court to reconsider the Order, so procedurally, there is no mechanism for this Court to reinstate the assault claim. Second, because this Court has federal questions jurisdiction over Muhonen's federal claims, the Court had supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to dismiss any claims based on state law.

Muhonen also makes references to being denied subsidized COBRA benefits under the American Recovery and Reinvestment Act.  (Pl.'s Cingular Br. at 9).  She has never asserted a claim, however, relating to the denial of such benefits.  Further, it appears from Muhonen's documents, that the Department of Labor determined Muhonen was entitled to subsidized COBRA premiums and ordered the plan administrator to reduce the COBRA premium.  (*Id.* at 9).

Muhonen contends that Cingular retaliated against her for filing a charge of discrimination with the Minnesota Department of Human Rights (MDHR) for sexual orientation discrimination.  (Pl.'s Cingular Br. at 3, 18-19).  Even if Muhonen arguably asserted this claim in her original state court Complaint [Doc. No. 1, Ex. A], she abandoned that claim in her First Amended Complaint [Doc. No. 57].  Further, such a claim would likely be barred by the statute of limitations.  Muhonen alleged in her state court Complaint that she received her right to sue letter from the MDHR on September 9, 2008.  Minn. Stat. § 363A.33 provides that a cause of action must be brought within 45 days of receiving the right to sue letter, requiring any complaint on this cause of action to  be filed by October 24, 2008.  Muhonen's initial Complaint was not filed until January 30, 2009, therefore any retaliation claim would be untimely.

Additionally, Muhonen makes reference to whistleblower retaliation and/or, the public policy exception to the at-will doctrine.[16]  (Pl.'s Cingular Br. at ¶ 21).  Again, Muhonen has never plead a claim based on the Minnesota Whistleblower Act, Minn. Stat. § 181.932, or the public-policy exception to the at-will doctrine.  There is no basis for the Court to rule on non-existent claims.

---

[16]   The Court notes that some of the cases cited by Muhonen are Colorado state cases. She has not provided any explanation as to why Colorado law, rather than Minnesota law, would apply to her termination.  All of the employment actions occurred in Minnesota.

Finally, Muhonen continues to make allegations suggesting Cingular committed disability discrimination and violated the American's with Disabilities Act (ADA).  Muhonen previously attempted to amend her complaint to add a claim under the ADA [Doc. No. 100]. Judge Nelson denied the motion to amend to add the ADA claim because Muhonen failed to exhaust her administrative remedies by never filing a charge of disability discrimination [Doc. No. 143].  Muhonen has not offered or moved for reconsideration of that Order, and this Court sees no reason to do so.

## IV.     RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.  Defendant Cingular Wireless Employee Services, LLC's Motion for Summary Judgment [Doc No. 175] be **GRANTED**; and

2.  Defendant Communications Workers of America Local 7200's Motion for Summary Judgment [Doc. No. 187] be **GRANTED**.

Dated:  April 7, 2011                          s/ Steven E. Rau_____
                                               STEVEN E. RAU
                                               United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **April 22, 2011** a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.